## Reference Request Sheet

**Reference Request #:** ARR1-581498531

**Request Category:** General Reference

**Transfer #:** C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-MIL

**Container #:** 8

**Asset #:** AAC1-2226196

**Asset Location:** CHI-01-0A-040-2-026-03-003

**Case/File Information:** 02-CR-87 USA V JOSEPH KONOPKA

**Whole Container:** N    **Public Request:** N

**Creation Date:** 11/06/2012

**Charge Code:** 00

**Requested By:** LISA TERAN
U.S. Courts

**Assigned To:**
**Batch #:** AS2311-1
**Ship To:**
LISA TERAN
US DISTRICT COURT, 517 E. WISCONSIN AVE. RM. 362
MILWAUKEE, WI, 53202

**Shipping Method:** SmartScan
**Shipping Acc #:** N/A
**Nature of Service:** SmartScan
**Service Level:** Standard
**Source:** Portal
**Email:** lisa_teran@wied.uscourts.gov

**Agency Comments:**
#1 Indictment filed on 5-7-02 and the Plea Agreement #20 filed on 12-20-02

11/6/2012 11:30:42 AM

---



AS2311-1                    CHI-01-0A-040-2-026-03-003

**Transfer#:** C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-MIL        **Box:8  CC:00**

ARR1-581498531        **Asset#:** AAC1-2226196        **Whole Container:** N

**C/F:** 02-CR-87 USA V JOSEPH KONOPKA        **Created:** 11/6/2012

General Reference        SmartScan

Standard        SmartScan        N/A

**To:** LISA TERAN
US DISTRICT COURT, 517 E. WISCONSIN AVE. RM. 362
MILWAUKEE, WI, 53202
P : (414) 297-1209        F : (414) 297-3203

Copy hand-delivered
to chambers

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

U.S. DISTRICT COURT
EASTERN DISTRICT-WI
FILED

'02  DEC 20  A10 :55

SOFRON J. NEDILSKY
CLERK

UNITED STATES OF AMERICA,

        Plaintiff,

       v.                            Case No. 02-Cr-87

JOSEPH D. KONOPKA,

        Defendant.

---

## PLEA AGREEMENT

---

1.     The United States of America, by its attorneys, Steven M. Biskupic, United States Attorney for the Eastern District of Wisconsin, and Stephen A. Ingraham, Assistant United States Attorney, and the defendant, Joseph D. Konopka, individually and by attorney Patrick Cavanaugh Brennan, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.     The defendant has been charged in thirteen counts of a thirteen-count indictment which allege violations of Title 18, United States Code, Sections 32(a)(3), 371, 844(h), 844(i), 1030(a)(5)(A), 1362, 1366(b), 2320 and 2511(1)(a).

3.     The defendant has read and fully understands the charges contained in the indictment and fully understands the nature and elements of the crimes with which he has been charged and those charges and the terms and conditions of the plea agreement have

been fully explained to him by his attorney.

4. The defendant voluntarily agrees to plead guilty to the following counts set forth in full as follows:

### COUNT ONE

*THE GRAND JURY CHARGES:*

*That from on or about February 14, 1998, and continuing to on or about January 25, 2001, in the State and Eastern District of Wisconsin and elsewhere,*

JOSEPH D. KONOPKA,
a/k/a "DR. CHAOS,"

*knowingly combined, conspired, confederated and agreed with others known and unknown to the grand jury, to commit the following offenses against the United States:*

*1. To willfully and maliciously injure or destroy, or interfere with any of the works, property, or material of any means of communication used or intended to be used for military or civil defense functions of the United States, all in violation of Title 18, United States Code, Section 1362;*

*2. To knowingly and willfully damage the property of an energy facility in an amount exceeding $5,000, all in violation of Title 18, United States Code, Section 1366(b);*

*3. To willfully damage, destroy or disable any air navigation facility in a way likely to endanger the safety of an aircraft in flight, all in violation of Title 18, United States Code, Section 32(a)(3);*

*4. To maliciously damage or destroy by means of fire any building used in interstate commerce, all in violation of Title 18, United States Code, Section 844(i).*

## DESCRIPTION OF THE CONSPIRACY

5.     During the period of the conspiracy, defendant Joseph D. Konopka, a/k/a "Dr. Chaos," was the self-appointed leader of a loose affiliation of persons called "The Realm of Chaos," which recruited its members 1) from participants in the Internet Relay Chat ("IRC") channel that defendant Konopka operated called, "#teens4satan" or "Teens For Satan," 2) from youths identified as customers of the Infinity Technology network services, and 3) from friends and associates of other participants in "The Realm of Chaos."

6.     Defendant Konopka would identify young males, often minors, from either the customer base of his employer at the time, Infinity Technology, Inc. of Green Bay, Wisconsin, or from friends of the previously recruited young males, and induce such persons to join him in ventures designed to entertain themselves by engaging in property damage and then observing the consequences.  Such property damage included attacks on communications and energy facilities, air navigation facilities, and buildings used in interstate commerce.

7.     Defendant Konopka would drive one or more of these young recruits with him to the locations of communications and energy facilities, air navigation facilities, or buildings used in interstate commerce, where defendant Konopka would damage or attempt to damage such facilities by fire, electrical short-circuiting, or other means.

8.     Defendant Konopka would further instruct these young recruits how to cause such property damage, encourage or require them to participate in such attacks, and reward them for their active participation.

## ACTS IN FURTHERANCE OF THE CONSPIRACY

9.     In furtherance of the conspiracy and to effect its objects, defendant Joseph D.

3

Konopka committed or caused to be committed by others the following overt acts:

a.   On or about February 14, 1998, at Shirley Road, Ledgeview, Wisconsin, in Brown County, Joseph Konopka attempted to access a computer and caused system failure at the Wisconsin Public Service wind turbine facility, causing nominal damage;

b.   On or about February 14, 1998, at Video Lane, Ledgeview, Wisconsin, in Brown County, Joseph Konopka interrupted WLUK-TV transmission operations by damaging the power supply box, causing approximately $1,000 damage;

c.   On or about February 23, 1998, at 3270 Shirley Road, Ledgeview, Wisconsin, in Brown County, Joseph Konopka kicked in the screens at the base of the Wisconsin Public Service wind turbine, causing approximately $400 damage;

d.   On or about March 4, 1998, at 219 James Street, Green Bay Wisconsin, in Brown County, Joseph Konopka broke into an electrical power distribution substation with a bolt cutter and tampered with a breaker switch at the Wisconsin Public Service substation, causing a power outage and approximately $10,000 damage;

e.   On or about July 4, 1998, at 2100 Morrow Street, Green Bay, Wisconsin, in Brown County, Joseph Konopka broke into an electrical power distribution substation with a bolt cutter and threw barbed wire onto a distribution feeder array, causing a power outage at the Wisconsin Public Service Preble substation and approximately $10,000 damage;

f.   On or about July 16,1998, at 933 Anderson Drive, Ashwaubenon, Wisconsin, in Brown County, Joseph Konopka destroyed a food processing and distribution facility by starting a fire in an adjacent dumpster at the Heavenly Hams company, causing approximately $264,708 damage;

g.   On or about August 7, 1998, at 5872 Hwy 57, Green Bay, Wisconsin, in Brown County, Joseph Konopka broke into the Wisconsin Public Service Dyckesville substation with a bolt cutter and threw barbed wire across an electrical distribution array, causing a power outage and approximately $10,000 damage;

h.   On or about August 15, 1998, at Scray Hill Road, Ledgeview, Wisconsin, in Brown County, Joseph Konopka removed air navigation hazard beacons at the WBAY-TV tower, causing approximately $5,250 damage and endangering any aircraft flying in the vicinity;

i.   On or about September 13, 1998, at 1351 Lime Kiln Road, County Highway V in Green Bay, Wisconsin, in Brown County, Joseph Konopka broke into the Wisconsin Public Service substation using bolt cutters and threw barbed wire on an electrical distribution array, causing a brief power outage and approximately $112 damage;

4

j.    On or about November 9, 1998, at the 11th Avenue substation, Springville, Wisconsin, in Adams County, Joseph Konopka and three co-conspirators threw barbed wire on an Adams Columbia Electric Coop electrical distribution array, causing a power outage and approximately $23,116 damage;

k.    On or about November 9, 1998, at W2874 Fern Drive substation, Montello, Wisconsin, in Marquette County, Joseph Konopka and three co-conspirators threw barbed wire on an Alliant Utilities electrical distribution array, causing a power outage and damages included in j above;

l.    On or about November 20, 1998, at State Highway 54 & Birch Road, Algoma, Wisconsin, in Kewaunee County, Joseph Konopka and two co-conspirators broke into a Wisconsin Public Service transmission structure with bolt cutters and tampered with three transmission and breaker switches, causing a power outage and more than $16,000 damage;

m.    On or about November 21, 1998, at 5872 Highway 57, Green Bay, Wisconsin, in Brown County, Joseph Konopka and two co-conspirators threw barbed wire on a transformer array at the Wisconsin Public Service Dyckesville substation, causing a power outage and approximately $10,300 damage;

n.    On or about November 22, 1998, at State Highway 29 & Town Hall Road, Kewaunee, Wisconsin, in Kewaunee County, Joseph Konopka and one co-conspirator destroyed the Kewaunee Nuclear Power Plant westward facing civil defense siren by fire, causing approximately $30 damage;

o.    On or about May 23, 1999, at Volk Field, Camp Douglas, Wisconsin, in Adams County, Joseph Konopka turned off the power supply to the radar and relay equipment at the Wisconsin Air National Guard base, causing a loss of air navigation communications and approximately $1,287 damage;

p.    On or about June 28, 1999, at Mystery Hills substation, County Highway G, Ledgeview, Wisconsin, in Brown County, Joseph Konopka and one co-conspirator threw barbed wire on an electrical distribution array at a Wisconsin Public Service substation, causing a power outage and approximately $2,751 damage;

q.    On or about August 1, 1999, at State Highway 54 & Birch Road, Algoma, Wisconsin, in Kewaunee County, Joseph Konopka and two co-conspirators broke into a Wisconsin Public Service transmission structure with a bolt cutter and tampered with three transmission and breaker switches, causing a power outage and approximately $3,933 damage;

r.    On or about August 14, 1999, at Volk Field, Camp Douglas, Wisconsin, in Adams County, Joseph Konopka broke into the microwave communications facility, turned off the power and disconnected the back up power supply, causing a power outage and approximately $2,278

5

damage;

s.    On or about September 20, 1999, at LeFever Road, Red River, Wisconsin, in Kewaunee County, Joseph Konopka broke into a Madison Gas & Electric wind turbine with bolt cutters and tampered with voltage regulator controls, causing approximately $40 damage;

t.    On or about September 27, 1999, at Femeree Road, Casco, Wisconsin, in Kewaunee County, Joseph Konopka and one co-conspirator broke into a Madison Gas & Electric wind turbine with a bolt cutter and tampered with voltage regulator controls, causing approximately $40 damage;

u.    On or about February 6, 2000, at Hwy 54 and 55, Seymour, Wisconsin, in Outagamie County, Joseph Konopka and one co-conspirator broke into an electrical power control unit with a bolt cutter and tampered with breaker switches at a Wisconsin Electric Power Company power distribution pole, causing a power outage and approximately $3,271 damage;

v.    On or about March 4, 2000, at County Hwy PP and F, Town of Brooklyn, Wisconsin, in Green Lake County, Joseph Konopka and two co-conspirators broke into an electrical power control switch with a bolt cutter and damaged Alliant Utilities breaker switches, causing a power outage and approximately $3,668 damage;

w.    On or about March 4, 2000, at Locust Road & County Highway E, Ripon, Wisconsin, in Fond du Lac County, Joseph Konopka and two co-conspirators broke into an electrical power control switch with a bolt cutter and damaged Alliant Utilities breaker switches, causing a power outage and damages included in v above;

x.    On or about June 7, 2000, at Locust Road & County Highway E, Ripon, Wisconsin, in Fond du Lac County, Joseph Konopka and two co-conspirators broke into three electrical power control switches with a bolt cutter and damaged Alliant Utilities breaker switches, causing a power outage and approximately $546 damage;

y.    On or about June 26, 2000, at Hobart Lift Station #2, Hobart, Wisconsin, in Brown County, a co-conspirator damaged a Wisconsin Public Service electrical power supply, disabling the sewerage lift pump and causing approximately $169 damage;

z.    On or about July 4, 2000, at Highway 54 and 55, Seymour, Wisconsin, in Outagamie County, Joseph Konopka broke into an electrical power control switch with a bolt cutter and damaged a Wisconsin Electric Power Company breaker switch, causing a power outage and approximately $4,200 damage;

aa.    On or about July 8, 2000, Highway 47 and Wege Road, Center, Wisconsin, in Outagamie County, Joseph Konopka broke into an electrical power control switch with a bolt cutter and

damaged a Wisconsin Electric Power Company breaker switch, causing a power outage and approximately $14,427 damage;

bb.    On or about July 9, 2000, at E2225 Femeree Road, Casco, Wisconsin, in Kewaunee County, Joseph Konopka and one co-conspirator broke into a Madison Gas & Electric wind turbine with a bolt cutter and disabled voltage regulator controls on a generator, causing a turbine shutdown and approximately $100 damage;

cc.    Between on or about June 30, 2000 through on or about July 19, 2000, at Luxemburg, Wisconsin, in Kewaunee County, Joseph Konopka and one co-conspirator broke into a Madison Gas & Electric wind turbine with a bolt cutter and tampered with the voltage regulator switch at a generator, causing a turbine shutdown and approximately $18 damage;

dd.    On or about July 14, 2000, at Merrill hydro-electric dam, 400 Park Street, Merrill, Wisconsin, in Lincoln County, Joseph Konopka and one co-conspirator caused an electrical short that shut down turbine #2 at the Wisconsin Public Service hydro-electric dam, causing a shut down of the generator and approximately $1,773 damage;

ee.    On or about August 13, 2000, at Highway 54 and Birch Road, Algoma, Wisconsin, in Kewaunee County, Joseph Konopka and one co-conspirator broke into a Wisconsin Public Service transmission structure with bolt cutters and tampered with three transmission and breaker switches, causing a power outage and approximately $2,470 damage;

ff.    On or about August 18, 2000, at 6th Road, north of County Highway D, Oxford, Wisconsin, in Marquette County, Joseph Konopka damaged the cell tower propane supply at a Cellulink cellular telephone tower, causing a propane fire, failure of the transmission facility, and damage;

gg.    On or about August 20, 2000, at N6598 County Trunk R, Cecil, Wisconsin, in Shawano County, Joseph Konopka and one co-conspirator damaged a Wisconsin Electric Power Company electrical meter, causing a power outage to the Cellular One telephone transmission facility and approximately $318 damage;

hh.    On or about August 22, 2000, at 24466 Wege Road, Mackville substation, Center, Wisconsin, in Outagamie County, Joseph Konopka and one co-conspirator broke into the substation with a bolt cutter and threw barbed wire on a transformer array at a Wisconsin Electric Power Company substation, causing a brief power outage and approximately $500 damage;

ii.    On or about August 22, 2000, at County Trunk C & Wall Road, Cecil, Wisconsin, in Shawano County, Joseph Konopka and one co-conspirator removed a regulator valve and attempted to set fire to escaping natural gas at the American Natural Resources Wisconsin,

7

Gas Company pipeline, causing nominal damage;

jj. On or about August 27, 2000, at State Highway 32, north of Pulaski, Angelica, Wisconsin, in Oconto County, Joseph Konopka broke into an electrical power control switch with a bolt cutter and damaged a Wisconsin Electric Power Company breaker switch, causing a power outage and approximately $5,700 damage;

kk. On or about August 31, 2000, at W Hwy 55, north of State Highway 114, Harrison, Wisconsin, in Calumet County, Joseph Konopka and two co-conspirators broke into an electrical power control switch with a bolt cutter and damaged a Wisconsin Electric Power Company breaker switch, causing a power outage and approximately $3,500 damage;

ll. On or about September 1, 2000 at John Street, Markesan, Wisconsin, in Green Lake County, Joseph Konopka and two co-conspirators damaged an Alliant Utilities electrical junction box, causing approximately $121 damage;

mm. On or about September 16, 2000, at N5799 Highway 32, Oconto Falls, Wisconsin, in Shawano County, Joseph Konopka and two co-conspirators set fire to a Wisconsin Gas Company pipeline facility, causing a facility shutdown and approximately $1,500 damage;

nn. On or about September 16, 2000, at Shirley Road, Ledgeview, Wisconsin, in Brown County, Joseph Konopka and two co-conspirators broke in and removed the normal program content and substituted unauthorized program music at WHID Wisconsin Public Radio, causing a system disconnect to emergency broadcast civil defense functions and approximately $100 damage;

oo. On or about September 29, 2000, at Hortonville, Wisconsin, in Outagamie County, Joseph Konopka and two co-conspirators pulled up and damaged a Wisconsin Electric Power Company power cable, causing approximately $350 damage;

pp. On or about October 7, 2000, at Hobart Lift Station #1 Hobart, Wisconsin, in Brown County, a co-conspirator damaged the Wisconsin Public Service power supply, causing failure of the sewerage lift pump and approximately $386 damage;

qq. On or about October 7, 2000, at W7841 Smith Street, Shiocton, Wisconsin, in Outagamie County, Joseph Konopka and two co-conspirators broke in and started a fire that destroyed a Bush Brothers and Company equipment facility, causing approximately $52,538 damage, and another approximately $2,500 damage to electrical equipment of Wisconsin Electric Power Company;

rr. On or about November 4, 2000, at W169 Weiler Road, Kaukauna, Wisconsin, in Outagamie County, Joseph Konopka broke in and damaged the WNCY radio and Midwest Communications emergency power generator propane supply, causing a fire and power

8

outage and approximately $850 damage;

ss.    On or about November 12, 2000, at Birch Road, State Highway 54, Algoma, Wisconsin, in Kewaunee County, Joseph Konopka and one co-conspirator started a fire that destroyed the Milwaukee Repeater Service two way radio transmission equipment structure located at the base of the Milwaukee Repeater Service transmission tower, causing approximately $14,080 damage;

tt.    On or about December 16, 2000, at Highways 54 and D, Algoma, Wisconsin, in Kewaunee County, Joseph Konopka and one co-conspirator broke into an electrical power control switch with a bolt cutter and damaged a Wisconsin Public Service breaker switch at Algoma Utilities, causing a power outage and approximately $6,664 damage;

uu.    On or about December 28, 2000, at Denmark, Wisconsin, in Brown County, Joseph Konopka set fire to and destroyed the WZOR radio transmission facility, causing approximately $271,673 damage;

vv.    On or about January 8, 2001, at State Highway 32, North of Pulaski, Angelica, Wisconsin, in Oconto County, Joseph Konopka broke into an electrical power control switch with a bolt cutter and damaged a Wisconsin Electric Power Company breaker switch, causing a power outage and approximately $1,000 damage;

ww.    On or about January 13, 2001, at Breezewood Lane, Rhyner Road, Vinland, Wisconsin, in Winnebago County, Joseph Konopka broke into a set of three electrical power distribution switches with a bolt cutter and damaged three breaker switches and an enclosure at a Wisconsin Electric Power Company substation, causing a power outage and approximately $21,800 damage;

xx.    On or about January 16, 2001, Highway H, Markesan, Wisconsin, in Green Lake County, Joseph Konopka broke into an electrical power control switch with a bolt cutter and damaged a Alliant Utilities breaker switch, causing approximately $160 damage;

yy.    On or about January 16, 2001, at Volk Field, Camp Douglas, Wisconsin, in Adams County, Joseph Konopka and one co-conspirator damaged government communications equipment at the Wisconsin Air National Guard base, causing approximately $182 damage;

zz.    On or about January 20, 2001, at Highway H, Markesan, Wisconsin, in Green Lake County, Joseph Konopka, broke into an electrical power control switch with a bolt cutter and damaged a Alliant Utilities breaker switch, causing a power outage and approximately $13,450 damage; and

aaa.    On or about January 20, 2001, at N1440 County Road A, Markesan, Wisconsin, in Green Lake County, Joseph Konopka damaged two Alliant Utilities electrical meters, causing

9

*approximately $1,575 damage.*

*These acts caused approximately twenty eight power outages and approximately twenty other service interruptions, affecting in excess of thirty thousand power customers, and causing damages in excess of $800,000.*

*All in violation of Title 18, United States Code, section 371.*

*...*

### COUNT NINE

*THE GRAND JURY FURTHER CHARGES:*

*That on or about October 7, 2000, in Outagamie County in the State and Eastern District of Wisconsin,*

### JOSEPH D. KONOPKA,

*a/k/a Dr. Chaos, maliciously damaged and destroyed by means of fire, a building of the Bush Brothers food processing company, located at W7841 Smith Street, Shiocton, Wisconsin, which building was used in interstate commerce.*

*All in violation of Title 18, United States Code, section 844(i).*

### COUNT TEN

*THE GRAND JURY FURTHER CHARGES:*

*That on or about October 7, 2000, in Outagamie County in the State and Eastern District of Wisconsin,*

### JOSEPH D. KONOPKA,

*a/k/a Dr. Chaos, knowingly used fire to commit arson of a building used in interstate commerce, to wit, a building of the Bush Brothers food processing company, as alleged in Count Nine, a felony*

10

*punishable in a court of the United States.*

*All in violation of Title 18, United States Code, section 844(h).*

## COUNT ELEVEN

*THE GRAND JURY FURTHER CHARGES:*

*That from on or about January 1, 1997, to on or about January 25, 2001, in Brown County in the State and Eastern District of Wisconsin,*

### JOSEPH D. KONOPKA,

*a/k/a Dr. Chaos, intentionally did traffic and attempt to traffic in goods, to wit, computer software, and knowingly used counterfeit marks on and in connection with such goods, that is, Electronic Arts software, which counterfeit marks were identical with and substantially indistinguishable from genuine marks in use and registered for those goods on the principal register in the United States Patent and Trademark Office, and the use of which marks was likely to cause confusion, to cause mistake, and to deceive.*

*All in violation of Title 18, United States Code, section 2320.*

## COUNT TWELVE

*THE GRAND JURY FURTHER CHARGES:*

*That from on or about December 1, 1998, to on or about February 1, 1999, in Brown County in the State and Eastern District of Wisconsin,*

### JOSEPH D. KONOPKA,

*a/k/a Dr. Chaos, knowingly caused the transmission of a program, information, code, and command, and as a result of such conduct, intentionally caused damage in excess of $5,000 without authorization to a protected computer, to wit, a computer operated by Internet service provider*

11

*Ultimate Fun World  2, which computer was used in interstate commerce and communication.*

*All in violation of Title 18, United States Code, section 1030(a)(5)(A).*

### COUNT THIRTEEN

*THE GRAND JURY FURTHER CHARGES:*

*That from on or about November 1, 1999, and continuing to on or about January 25, 2001, in Green Bay in the State and Eastern District of Wisconsin,*

### JOSEPH D. KONOPKA,

*a/k/a Dr. Chaos, did intentionally intercept and endeavor to intercept an electronic communication, to wit, electronic mail communications between customers of two Internet service providers, Ultimate Fun World and Infinity Technology, by installing an unauthorized computer code – a program named "Snoop" – on the mail server at Infinity Technology, which computer code was designed to intercept all electronic mail communications between those two Internet service providers.*

*All in violation of Title 18, United States Code, section 2511(1)(a).*

5.  The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offenses described in paragraph 4.  The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the following facts beyond a reasonable doubt.  The defendant admits to these facts and that these facts establish his guilt beyond a reasonable doubt:


Mr. Konopka used his computer skills to get employment as the system operator at

12

Green Bay Internet service provider (ISP) Infinity Technology, and used those skills and his access to that ISP's sophisticated computer network to recruit minors to assist him in carrying out property damage attacks on infrastructure facilities, mostly in northeastern Wisconsin, including through the use of arson. Mr. Konopka also carried out a several months' duration cyber attack on a small local ISP, intercepted e-mail traffic between the two ISP's, and pirated and sold counterfeit computer software.

In late January 2001 a friend of one of Mr. Konopka's associates told authorities in Brown County the kind of criminal activities that the associate was doing with Mr. Konopka. When the associate confirmed the allegations, Mr. Konopka was arrested on January 25, 2001. At that time Mr. Konopka signed a waiver of his Miranda rights and said that:

> *he uses the online name DOC_CHAOS, having done so since 1991 on particular Internet relay chat channels (IRC), including "Teens for Satan", which is a spoof of "Youth for Christ" and not an expression of Konopka's true beliefs;
> *he likes to go to industrial or heavy metal rock concerts in LaCrosse at the Warehouse;
> *he uses many hacker tools at his place of employment, Infinity Technology, which he has full authority to do as the system and network administrator.

Mr. Konopka also signed a consent form allowing searches of his room and other common locations at his grandmother's residence; his automobile; laptop and home computers, and his work station at his work place.

Mr. Konopka further stated that:

> *he has several young associates whom he has met through the IRC (naming 7 of them), and he takes them rummaging through dumpsters for equipment, obtaining much or all his cell phone, radio transmission, and computer

hardware equipment;

*he goes to the LaCrosse concerts with some of these persons;

*the Internet domain name "Realm of Chaos" was defunct, having been created by
him and used until 1997, using the servers at Infinity to host it;

*he used his home computer to make illegal copies of numerous software titles,
which he sold to others; (other evidence introduced at trial would verify this
admission, and in particular that many software titles of registered trademark
holder Electronic Arts were copied);

*he had made many HTH combustion bombs (a combination of brake fluid and pool
shock), and used these to commit arson, like burning trash, dumpsters and
abandoned furniture;

*he had manufactured and detonated at least 15 dangerous explosive devices,
including 2 pipe bombs, a number of propane bombs, and a number of black
powder bombs;

*he had used a number of explosive chemicals, including crystal ammonium iodide,
propane, HTH, black powder, and others. (Items recovered in the search at his
grandmother's included ammonium anhydrous, black gun powder, nail polish
remover, propane, lighter fluid, mercury, white powder, brake fluid, and a
pressurized helium container.)

After this confession in January 2001, eleven of Mr. Konopka's associates, who

would be called as witnesses at trial, confirmed that Mr. Konopka was involved in numerous

acts of property damage and vandalism through the use of explosives, fire, and power

outages; that he sought to enforce discipline by intimidating his followers; and that he pirated

and sold software. One of these associates would testify that when Mr. Konopka "did a

power pole he would always drive into town to make sure that the lights went off."

This associate also said that in 1997 and 1998 he and Mr. Konopka lighted HTH bomb

fires in dumpsters near the Salvation Army and a Taco Bell in Green Bay.

The testimony of associates, Mr. Konopka's statements, and other testimony about

property damage introduced at trial would show that Mr. Konopka committed various

14

criminal acts in these counties: in the Eastern District of Wisconsin, Brown, Outagamie, Oconto, Fond du Lac, Green Lake, Calumet, Winnebago, Kewaunee, Door, Shawano, and Marquette; plus Adams and Lincoln Counties in the Western District. This evidence would show a discernable pattern to the property damage incidents:

*at least 18 incidents involved the use of bolt cutters to gain access to electrical breaker switches (gang operated or air breakers) or cycle breakers to cut off electric power;

*at least seven incidents involved the use of bolt cutters and barbed wire thrown over fences of substations to cut off power to feeder arrays and transformers;

*at least five incidents involved the use of bolt cutters to damage the voltage regulator controls on wind turbine generators;

 *at least four incidents involved malicious damage to miscellaneous energy facilities; and

*at least four incidents involved the use of fire to damage power equipment.

Several of Mr. Konopka's associates indicated that he had instigated many of these incidents, and named particular acts in which they participated to varying degrees and/or knew Mr. Konopka himself to have done:

*One associate said he participated with Mr. Konopka in at least six incidents from late 1998 to early 2000;
*Another associate said he participated with Mr. Konopka in at least three incidents in late 1998;
*A third associate said he participated with Mr. Konopka in at least 14 incidents from the Spring of 2000 to the Fall of 2000;
*A fourth associate said he participated with Mr. Konopka in at least 6 incidents over the same period;
*Four other associates admitted to participating with Mr. Konopka in four additional such acts during the summer and fall of 1999, and December of 2000

15

These separate admissions by Mr. Konopka's associates left about 15 suspected incidents of property damage by Mr. Konopka unwitnessed; however, these unwitnessed events were properly seen as signature crimes due to the similarity of targets and the means of causing the damage.

After Mr. Konopka's arrest in January of 2001, this ongoing pattern of attacks over a three-plus year period ceased: the number of power outages caused by vandalism in the affected region dropped from more than 28 to zero, and the number of minor arsons dropped from more than 200 to a handful. After this arrest, Mr. Konopka was charged in four Wisconsin counties during the first half of 2001, and in June 2001, he jumped bail and went to Chicago.

Mr. Konopka was arrested in a steam tunnel at the University of Illinois at Chicago by campus police staked out there at about 2 a.m. on Saturday morning, March 9, 2002 to catch a vandal/trespasser. Arrested with him was a juvenile male; another such person escaped. Later that day, after waiving his Miranda rights in writing, Mr. Konopka was interviewed and confessed to various crimes while living in Chicago over the past several months.

The following day, March 10, 2002, Mr. Konopka again signed a waiver of his Miranda rights and wrote a confession, making these points:

*he produced and distributed counterfeit computer software (**see Count Eleven**);

*he attacked Green Bay ISP Ultimate Fun World (UFW) with a program that would

re-route ISP users to pornographic web sites for several months from late 1998 and to 1999 (**see Count Twelve**) (this confession would be corroborated at trial with evidence showing that UFW lost more than $5,000 in damages from this action, and that UFW's computer was a legally protected computer used in interstate communication);

\*he intercepted e-mail traffic between Green Bay ISP's Ultimate Fun World and Infinity Technology from the fall of 1999 to January 2001 (**see Count Thirteen**);

\*between the spring of 1997 and January of 2001, he was involved in "multiple acts of property damage" including –

– damage to utilities, like gang operated breakers, electrical distribution substations, cell phone, radio transmission, sewerage, water utility, telephone, and electrical generation facilities, often with one or more of the twelve different named associates from the "Realm of Chaos" whom he recruited and led, having discovered them on the Internet;

– he encouraged them to join him in these acts "to take personal entertainment out of observing the consequences of property damage ... I took personal satisfaction in causing this property damage because of a sense of intellectual superiority which I felt.";

– they cut locks on gang levers and switches mounted on utility poles, and actuated the switches and breakers, causing a loss of electrical power;

– they threw barbed wire across the feeder array at electrical power distribution substations, causing a short circuit and a loss of electrical power;

– they set fires using HTH incendiaries in dumpsters, garbage cans, discarded furniture, rural corn fields, and abandoned structures;

– they set other fires in various structures, mostly abandoned buildings, using mostly gasoline;

– they broke and entered various types of communication facilities located at the bases of radio, telephone, television and cell towers;

– he made 15 - 20 pipe bombs using pyrodex powder as the blasting agent, detonating most at his grandmother's in DePere, and others in rural mailboxes with two associates

– he was involved in particular incidents of property damage which he described, sometimes alone and sometimes with named others, on the following dates and places:

11/20/98 in Algoma (**see Count One, incident l**);

8/1/99 near Algoma (**see Count One, incident q**);

2/6/00 near Seymour (**see Count One, incident u**);

7/4/00 near Seymour (**see Count One, incident z**);

8/27/00 near Angelica (**see Count One, incident jj**);

1/8/01 near Angelica (**see Count One, incident vv**);

18

1/13/01 in Vinland (**see Count One, incident ww**);

7/4/98 in Green Bay (**see Count One, incident e**);

11/9/98 (misstated as 10/9/98) in Adams Co. and Montello (**see Count One, incidents j and k**);

6/28/99 in Ledgeview (**see Count One, incident p**);

5/23/99 at Volk Field in Camp Douglas (**see Count One, incident o**);

8/14/99 at Volk Field in Camp Douglas (**see Count One, incident r**);

8/18/00 in Oxford (**see Count One, incident ff and Count Five**);

11/12/00 in an unspecified location (**see Count One, incident ss and Count Seven**).

Mr. Konopka indicated that this written statement "does not completely list the activities in which me and my associates participated. ... This group of associates, known as the "Realm of Chaos," (ROC), was a group of personal associates which I recruited and led. I identified and recruited these youths via the Internet, and utilized the IRC channel "#teens4Satan" as a means of communicating with them. I encouraged the participants in the "Realm of Chaos" to join me in acts of property damage ..."

This confession would be corroborated at trial with evidence showing both that the confessed incidents of property damage occurred, and the testimony of several associates that they participated in one or more such incidents at Mr. Konopka's urging.

**Facts re. the Bush Brothers Fire: (Counts 9 and 10):**

On October 7, 2000, at about 4 am, in Bovina Township near the village of Shiocton in Outagamie County, a building housing equipment at the Bush Brothers sauerkraut pits was destroyed by arson after gasoline from a 6 gallon can was ignited in the building after the building was entered by force. Two juveniles [MA and BS] would testify that they accompanied Mr. Konopka to this location, and that Mr. Konopka and one of them [MA] entered a building at Bush Brothers by breaking in with a crowbar. One of the juveniles would further testify that inside the building, Mr. Konopka poured a flammable liquid over some electrical control panels in the building and set fire to it. The juveniles would also testify that Mr. Konopka drove them away from the building, but that they returned in about 5 minutes, and the building was in flames. The Shiocton Fire Dept. responded and put the fire out, but the building and its equipment was a total loss. The building, which housed electrical equipment and a generator, supplied power to run a sprinkler system dispersing waste products from a holding lagoon through a sprinkler into the fields as fertilizer.

The evidence would further indicate that the building was used in the business of Bush Brothers' sauerkraut, a business engaged in interstate commerce.

This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of or participation in these offenses.

## PENALTIES

6. The parties understand and agree that the offenses to which the defendant will enter a plea of guilty carry the following maximum term of imprisonment and fines: count one, five years and $250,000; count nine, five years minimum up to 20 years and $250,000; count ten, 10 years consecutive to sentence for count nine; count eleven, ten years and $2 million; count twelve, five years and $250,000; and count thirteen, five years and $250,000. Each count also carries a mandatory special assessment of $100.00, and a maximum of three years of supervised release, except count nine, which carries a maximum of five years of supervised release. The parties further recognize that a restitution order may be entered by the court. The parties' acknowledgments, understandings, and agreements with regard to restitution are set forth in paragraph 34 of this agreement.

7. The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## DISMISSAL OF REMAINING COUNTS

8. The government agrees to move to dismiss the remaining counts of the indictment at the time of sentencing.

## ELEMENTS

9. The parties understand and agree that in order to sustain the charge of conspiracy as set forth in count one, the government must prove each of the following propositions beyond a reasonable doubt:

21

First, that the conspiracy as charged in Count 1 existed;

Second, that the defendant knowingly became a member of the conspiracy with an intention to further the conspiracy; and

Third, that an overt act was committed by at least one conspirator in furtherance of the conspiracy.

The parties further understand and agree that in order to sustain the charge of using fire to damage a building used in interstate commerce, as set forth in count nine, the government must prove each of the following propositions beyond a reasonable doubt:

First, the defendant damaged or destroyed property, or attempted to do so;

Second, the defendant did so by means of fire or an explosive;

Third, the defendant did so with malice; and

Fourth, the property damaged or destroyed was used in interstate or foreign commerce, or in an activity affecting interstate or foreign commerce.

The parties further understand and agree that in order to sustain the charge of using fire to commit a federal felony, as set forth in count ten, the government must prove each of the following propositions beyond a reasonable doubt:

First, the defendant committed a federal felony; and

Second, the defendant did so by means of fire.

The parties further understand and agree that in order to sustain the charge of trafficking in counterfeit goods, as set forth in count eleven, the government must prove each

22

of the following propositions beyond a reasonable doubt:

First, that the defendant intentionally trafficked or attempted to traffic in goods;

Second, that the defendant used a counterfeit mark that was (a) spurious; (b) used in connection with trafficking in goods; (c) identical to or substantially indistinguishable from a registered trademark; and (d) likely to cause confusion, mistake or deception; and

Third, that the defendant knowingly used the counterfeit mark.

The parties further understand and agree that in order to sustain the charge of damaging a protected computer, as set forth in count twelve, the government must prove each of the following propositions beyond a reasonable doubt:

First, the defendant knowingly caused the transmission of a program/code/command/information and as a result intentionally caused damage without authorization to a computer;

Second, the impairment of the data resulted in losses to the victim(s) totaling at least $5,000 in value; and

Third, the computer damaged is a "protected computer" as defined in 18 U.S.C. § 1030(e)(2).

The parties further understand and agree that in order to sustain the charge of intercepting electronic communications, as set forth in count thirteen, the government must prove each of the following propositions beyond a reasonable doubt:

23

First, the defendant intercepted or endeavored to intercept an electronic communication;

Second, the defendant acted intentionally; and

Third, the communication involved interstate commerce and/or the compromised system affects interstate or foreign commerce.

## SENTENCING PROVISIONS

10. The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

11. The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act and the sentencing guidelines.

12. The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offenses set forth in paragraph 4. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

13. The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history for purposes of assisting the sentencing court in determining the defendant's criminal history category under the sentencing guidelines. The parties further acknowledge and understand

24

that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of defendant's criminal history category.

## Relevant Conduct

14. The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, using the 2000 version of the Guidelines pursuant to § 1B1.11(b)(1), the sentencing judge will consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offenses to which defendant is pleading guilty.

15. The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing court will consider the total amount of the loss incurred by the victims as a result of the offenses, even if not alleged in the offenses of conviction, and will use the total amount in calculating the sentencing guidelines range.

16. For purposes of determining the defendant's offense level under the sentencing guidelines, the government will recommend to the sentencing court that the amount of loss is greater than $800,000. The defendant does not agree with this loss amount. The parties acknowledge and understand that the amount of loss may differ from the amount of restitution imposed by the sentencing court. The parties' acknowledgments, understandings, and agreements with regard to restitution are set forth in paragraph 34 of this agreement.

25

## Sentencing Guidelines Calculations

17.   The parties acknowledge, understand, and agree that the sentencing guidelines recommendations included in this agreement represent the positions of the parties on the factors to be considered in calculating the appropriate sentence range under the sentencing guidelines.   The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range.   The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculation of the appropriate adjusted offense level, the government is not bound to make the recommendations contained in this agreement.

## Base Offense Level

18.   The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in count one is 6 under Sentencing Guidelines Manual §2F1.1.  Based on the amount of relevant conduct attributable to count one, the government will recommend that an eleven-level increase for amount of loss is applicable under Sentencing Guideline Manual § 2F1.1(b)(1)(L).   The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in count nine is 20 under Sentencing Guidelines Manual §2K1.4.  The parties further agree to recommend to the sentencing court that with respect to count ten, the sentence is the 10 year term of imprisonment consecutive to the term of imprisonment imposed under count nine, as required

26

by 18 U.S.C.§ 844(h) under Sentencing Guidelines Manual §2K2.4.  The parties further agree to recommend to the sentencing court that the applicable base offense level for the offense charged in count eleven is 8 under Sentencing Guidelines Manual §2B5.3.  Based on the amount of relevant conduct attributable to count eleven, the parties agree that an eight-level increase for amount of loss exceeding $70,000 is applicable under Sentencing Guideline Manual § 2F1.1(b)(1)(G).  The parties further agree to recommend to the sentencing court that the applicable base offense level for the offense charged in count twelve is 4 under Sentencing Guidelines Manual §2B1.3.  Based on the amount of relevant conduct attributable to count twelve, the parties agree that an four-level increase for amount of loss exceeding $5,000 is applicable under Sentencing Guideline Manual § 2B1.1(b)(1)(E). The parties further agree to recommend to the sentencing court that the applicable base offense level for the offense charged in count thirteen is 9 under Sentencing Guidelines Manual §2H3.1.

## Specific Offense Characteristics

19.  The parties agree to recommend to the sentencing court that a two-level increase for more than minimal planning under Sentencing Guidelines Manual §2F1.1(b)(2) and § 2B1.3(b)(3) is applicable to the offense level for the offense charged in counts one and twelve.  The parties further agree to recommend to the sentencing court that a two-level increase for an offense involving the conscious or reckless risk of serious bodily injury under Sentencing Guidelines Manual §2F1.1(b)(7)(A) is applicable to the offense level for the

offense charged in count one. The parties further agree to recommend to the sentencing court that a two-level increase for an offense involving the manufacture of infringing items under Sentencing Guidelines Manual §2B5.3(b)(2) is applicable to the offense level for the offense charged in count eleven.

## Role in the Offense

20. Pursuant to Sentencing Guidelines Manual § 3B1.1, the parties will recommend to the sentencing court that a four-level increase be given for an aggravating role in the offense, as the defendant was an organizer, leader, manager, or supervisor for the offenses charged in counts one and nine.

## Use of Special Skill

21. Pursuant to Sentencing Guidelines Manual § 3B1.3, the parties agree to recommend to the sentencing court that a two-level increase be given for use of special skill, as the defendant's specialized computer skills significantly facilitated commission of the offenses charged in counts twelve and thirteen.

## Using a Minor to Commit a Crime

22. Pursuant to Sentencing Guidelines Manual § 3B1.4, the parties agree to recommend to the sentencing court that a two-level increase be given for using a minor to commit a crime, as the defendant used persons less than eighteen years of age to commit the offenses charged in counts one, nine and ten.

## Vulnerable Victim

23.     Pursuant to Sentencing Guidelines Manual § 3A1.1(b)(2), the government will recommend to the sentencing court that a two-level increase be given for vulnerable victim, as the defendant knew or should have known that many of the acts in furtherance of the offense in count one involved a large number of vulnerable victims.  The defendant does not agree to this enhancement.

## Combined Offense Level

24. If the enhancement for vulnerable victim applies, the government will recommend that the combined offense level is 31 pursuant to Sentencing Guidelines Manual § 3D1.4. If the enhancement for vulnerable victim does not apply, the government will recommend that the combined offense level is 29 pursuant to Sentencing Guidelines Manual § 3D1.4.

## Acceptance of Responsibility

25.     The parties agree to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), and an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b), but only if the defendant exhibits conduct consistent with the acceptance of responsibility.

## Sentencing Recommendations

26. Both parties reserve the right to apprise the district court and the probation office of any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offenses as well as any and all matters which

29

might constitute aggravating or mitigating sentencing factors.

27. Both parties reserve the right to make any recommendation regarding any and all factors pertinent to the determination of the sentencing guideline range; the fine to be imposed; the length of supervised release and the terms and conditions of the release; and any other matters not specifically addressed by this agreement.

28. The parties agree to recommend a sentence of not less than twenty years. The parties further agree that if an upward departure is necessary to reach this result, that such grounds exist under Sentencing Guideline § 4A1.3, as the defendant's criminal history significantly under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit further crimes. If the bottom of the sentencing guideline range as determined by the court without an upward departure is greater than twenty years, the parties agree to recommend a sentence at the bottom end of the range. Upon the imposition of a sentence of twenty years imprisonment or more, the government agrees to seek dismissal of existing charges against the defendant for related conduct in Door, Kewaunee, Marquette, and Shawano Counties in the Eastern District of Wisconsin, and to ask authorities in other Wisconsin counties affected by the defendant's criminal conduct to refrain from filing any additional charges against the defendant for conduct included in this case. The defendant also understands that the government may seek to have the defendant's sentencing conducted in Green Bay. If the defendant is sentenced to a term of imprisonment of at least twenty years, the government agrees to take no position regarding

30

the defendant's request for imposition of a sentence concurrent to the sentence defendant will receive for Case No. 02-Cr-224 in the Northern District of Illinois

## Court's Determinations at Sentencing

29. The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The parties further understand that the United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the application of the sentencing guidelines and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 6 above.

30. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

31. The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable upon entry of the judgment of conviction. The defendant agrees not to request any delay or stay in payment of any and all financial obligations.

## Fine

32. The parties agree to recommend to the sentencing court that a fine within the sentencing guideline range, as determined by the court, be imposed against the defendant.

31

## Special Assessment

33. The defendant agrees to pay the special assessment in the amount of $600 prior to or at the time of sentencing.

## Restitution

34. The defendant agrees to pay restitution as ordered by the court to victims of the offenses. The defendant understands that because restitution for the offenses is mandatory, the amount of restitution shall be imposed by the court regardless of the defendant's financial resources. The defendant agrees to cooperate in efforts to collect the restitution obligation. The defendant understands that imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action.

## Forfeiture

35. The defendant agrees that pursuant to 18 U.S.C. § 2320(b), the sentencing court shall order forfeiture and destruction of all copies of any computer software seized from the defendant which bears counterfeit marks, and the means by which such infringing software was made or which was used to facilitate the offense. Such property includes the seized computer. The defendant agrees to the forfeiture of these properties and to the immediate entry of a preliminary order of forfeiture. The defendant agrees that he has an interest in each of the listed properties. The parties acknowledge and understand that the government reserves the right to proceed against assets not identified in this agreement.

## DEFENDANT'S WAIVER OF RIGHTS

36. In entering this agreement, the defendant acknowledges and understands that in so doing he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

    a.    If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

    b.    If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and her attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

    c.    If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

    d.    At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

    e.    At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could

be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

37. The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights.

38. The defendant acknowledges and understands that he will be adjudicated guilty of the offenses to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

39. The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

40. Based on the government's concessions in this agreement, the defendant knowingly and voluntarily waives his right to appeal his sentence in this case unless the sentence is greater than twenty years, and further waives his right to challenge his conviction or sentence in any post-conviction proceeding, including but not limited to a motion pursuant to 18 U.S.C. § 2255. This waiver does not extend to an appeal or post-conviction motion based on (1) any punishment in excess of the statutory maximum, (2) the sentencing court's reliance on any constitutionally impermissible factor, and (3) ineffective assistance of

34

counsel.

## Further Civil or Administrative Action

41.   The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

## GENERAL MATTERS

42.  The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

43.  The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

44.  The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of his conviction.

45.  The defendant understands that pursuant to the Victim and Witness Protection Act and the regulations promulgated under the Act by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offenses on the

35

victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

46. The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then any local, state or federal jurisdiction retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing.

## VOLUNTARINESS OF DEFENDANT'S PLEA

47. The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor

36

agreements reached, other than those set forth in this agreement, to induce the defendant to

plead guilty.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 12-19-02

JOSEPH D. KONOPKA
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 12-19-02

PATRICK CAVANAUGH BRENNAN
Attorney for Defendant

For the United States of America:

Date: December 20, 2002

STEVEN M. BISKUPIC
United States Attorney

Date: 12/20/02

STEPHEN A. INGRAHAM
Assistant United States Attorney

38